UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America, )
)
Plaintiff, ) 2:23-cr-01489-KML
)
v. ) Phoenix, Arizona
) April 20, 2026
Jose Antonio Santeros Placsencia, )
)
Defendant. )
__________________________________)

**BEFORE: THE HONORABLE KRISSA LANHAM, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

# A P P E A R A N C E S

For the Government:

UNITED STATES ATTORNEY'S OFFICE
By: **Jacqueline Nan Schesnol, Esq.**
2 Renaissance Square
40 N Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408

For the Defendant:

VERDURA LAW GROUP, PLLC
By: **Kaitlin Verdura, Esq.**
P.O. Box 45345
Phoenix, Arizona 85064

**P R O C E E D I N G S**

COURTROOM DEPUTY: This is Case No. CR23-01489, United States of America versus Jose Antonio Santeros Placsencia. This is the time set for sentencing.

MS. SCHESNOL: Good afternoon, Your Honor, Jacqueline Schesnol representing the United States.

THE COURT: Good afternoon, Ms. Schesnol.

MS. VERDURA: And good afternoon, Your Honor, Kaitlin Verdura on behalf of Mr. Placsencia.

THE COURT: Good afternoon, Ms. Verdura and Mr. Placsencia.

THE DEFENDANT: Good afternoon.

THE COURT: Mr. Placsencia, in an earlier proceeding you entered a plea of guilty to making a material false statement during the purchase of a firearm under a plea agreement that contained certain terms and conditions.

I have now accepted your guilty plea so we are ready to proceed with your sentencing this afternoon. Could you please state your full name and date of birth on the record.

THE DEFENDANT: Yes, Your Honor. It's Jose Antonio Santeros Placsencia. My birthday is August 8, 1987.

THE COURT: Thank you. Seems like you and I are understanding each other pretty well this afternoon. If ever that's not the case, would you please let Ms. Verdura know. She will let me know, and I'll go back and clarify or rephrase

because it's very important you understand what's happening here. Okay?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Could I have you pull the microphone a little bit closer. My court reporter listens to what's going on in the microphone and it wasn't catching everything.

All right. I want to start then by identifying what I have reviewed to prepare for the hearing. I have reviewed the Plea Agreement, the Presentence Report, the Pretrial Services' update, Mr. Placsencia's sentencing memo, the character letters that were submitted on his behalf, certificates from classes that Mr. Placsencia has taken and the letter from Mr. Placsencia himself.

Ms. Verdura, is there anything I'm missing from the defense?

MS. VERDURA: No, Your Honor.

THE COURT: Ms. Schesnol, from the government?

MS. SCHESNOL: No, Your Honor.

THE COURT: Then let's talk about the Presentence Report. Ms. Verdura, have you reviewed it with your client and do you have any errors or corrections to it?

MS. VERDURA: I have reviewed it, Your Honor. We have no additions, corrections or objections to its contents.

THE COURT: Thank you.

Ms. Schesnol, have you reviewed it and do you have

any errors or objections?

MS. SCHESNOL: I have reviewed it and no errors or objections.

THE COURT: Then I'll adopt the contents of the Presentence Report, and on that basis I find the Total Offense Level is 22 and the Criminal History Category is III, which results in an advisory guidelines range of 51 to 63 months.

Do the parties agree that's the advisory guidelines range that applies here?

MS. SCHESNOL: Yes, Your Honor.

MS. VERDURA: Yes, Your Honor.

THE COURT: The plea agreement provides that the sentence will not exceed 36 months. So that's going to require a downward variance, which the government, I assume, is going to be asking for. I am inclined to accept the plea agreement and sentence in accordance with its terms, but I would like to hear from the parties first.

Ms. Verdura, what would you like to say on your client's behalf?

MS. VERDURA: Thank you, your Honor.

We do have two speakers if they can start.

THE COURT: Yes, they can. Did you let us know that the speakers were coming in advance?

MS. VERDURA: I did, Your Honor. I e-mailed on March 11th. So I know there has been a lot of rescheduling.

THE COURT: Okay, no worries at all. Could I get the names and spellings of both of the speakers?

MS. VERDURA: Yes, Your Honor. Our first speaker is Carmen Aguilar, C-a-r-m-e-n. Aguilar, A-g-u-i-l-a-r.

THE COURT: Uh-huh.

MS. VERDURA: And our second speaker is Kayla Placsencia. Same spelling as Mr. Placsencia.

THE COURT: All right. Then, Ms. Verdura, I am fine with having them go first before you make any remarks and before Mr. Placsencia does. So if you'd like to go back to counsel table and call them up.

MS. VERDURA: Thank you, your Honor, and we'll start with Carmen.

MS. AGUILAR: Hello, Your Honor.

THE COURT: Hello.

MS. AGUILAR: I'm getting over a cold so I apologize. My voice is a little raspy.

My name's Carmen Aguilar. I'm Jose's fiancée, and I have known him for three years. We met on-line and after our first date we have been inseparable. Since then we've built a life together and we welcomed our son in July of 2024.

What stands out more -- the most to me about Jose is his consistency and dedication to his family. Every day he shows up, not just in words but in actions. After work he comes home and makes it a priority for us to sit together as a

family for dinner. He's actively involved with the kids and consistently makes time to coach my daughter in her softball skills, which has developed -- excuse me, which has helped build her confidence and development in her sport.

His presence at practices and games has also sparked our son's interest in baseball and he has now began coaching him as well.

We are a blended family, and he has fully embraced that role. In doing so, he has built a positive relationship with my daughter's half siblings. When we see them at the softball fields, they genuinely are excited to see him. That response reflects the bond that he has built with them through consistency, patience, and showing up regularly for my daughter.

His presence has also contributed to a more stable and cooperative co-parenting environment helping him improve what was once a very difficult dynamic and ultimately benefiting the children.

In his personal life -- in his professional life he has demonstrated that -- that same mind-set. While working at a motorcycle dealership, he took the initiative to organize community outreach efforts, including charity events, backpack drives and suitcase campaigns for children in foster care.

These were not part of his job duties, but efforts he chose to take on reflecting someone who looks for ways to

support others even when it's not required.

Jose is also someone his family depends on, and he is always available to his mother and sisters when they need support. He also continues to support his children in meaningful ways. His daughter, Makayla, who is here with us today, will soon be starting nursing school and he has committed to supporting her as she takes that next step.

In our home he has been my steady support system during some of my most difficult moments. After the birth of our son I experienced postpartum depression, and I continue to manage ADHD and an autoimmune condition that causes chronic fatigue. I'm also in school and work full time, which adds to my daily responsibilities.

On days when I struggle to function, he steps in without hesitation caring for our kids and ensuring that our household continues to run. His support has been consistent, patient and selfless. I understand the seriousness of why we are here today.

Jose has expressed deep regret for his past actions, particularly for the time he has lost with his children earlier in their lives as a result of those decisions. From what I have witnessed, that regret has translated into meaningful change.

He is committed to a different lifestyle and has consistently followed the conditions placed upon him,

including maintaining his sobriety and attending therapy. He has taken that responsibility seriously and with discipline.

He's also been intentional about surrounding himself with more positive, goal-oriented influences and distancing himself from environments that do not align with the life that he is building. Looking ahead, we are committed to continuing to build a stable and positive life together.

In addition to creating a permanent home for our family, we have discussed plans to start a nonprofit staffing agency focused on supporting individuals reintegrating into society after incarceration.

Through his own experience, he understands how difficult reintegration can be without the right support system. He was fortunate to already have an education and a career path, which made it easier for him to establish stability, something he recognizes is not the case for many others.

With my background in human resources and his experience in sales, marketing and business development, we hope to provide job placement support with training and communication and workplace skills. With my experience in recruiting, I found that individuals given a second chance are often the most dedicated and hard-working employees.

While this is currently on hold due to our circumstances, it reflects the direction we are committed to,

focused on growth, stability and giving back. It's important to him to use his experience to help others avoid similar mistakes and create a better path forward.

If Jose was to be absent from our home for a significant period, it would have a real impact on our family. I do not have immediate family nearby, and he plays a central role in the daily stability and care for our children. While I would do everything in my power to provide for him, his absence would create significant challenges for our household that would deeply be felt both practically and emotionally.

Your Honor, I respectfully ask that you consider the person that Jose is today. In the time I have known him he has shown a genuine commitment to growth, responsibility and family. We are a large, blended family and he has worked hard to be a steady and positive presence in all of our lives. I believe he's on the path that reflects those values, and I'm grateful to stand besides him as he continues forward.

Thank you for your time.

THE COURT: Thank you, Ms. Aguilar.

MS. AGUILAR: Thank you.

MS. VERDURA: And next we have Kayla.

THE COURT: Please go ahead and take your time.

MS. PLACSENCIA: Okay. Hi, Your Honor. My name is Makayla Placsencia and I'm Jose's eldest child. I do not excuse my father for his past actions, but I do want to share

about the man I've come to know, the man he is today, and the transformation I've personally witnessed.

Over the past few years my father has changed in a way that is real and undeniable. During this time, he turned to Christ and his faith has given him a new sense of purpose, discipline and direction. I've seen him become more patient, more intentional and committed to living a life rooted in integrity and service to others.

His faith is not something we just speak about, but it's something I see him actively live out every day. One of the most meaningful examples of his change of character is how he supported me during the hardest time of my life. Around this time last year I was struggling with anorexia and other serious mental and physical health issues that were causing my body to shut down. Many people recognized how severe it was but did nothing.

My father, on the other hand, not only saw what I was going through, but he took action. He text me every single day, calling me, checking in on me, reminding me to eat, encouraging me to pray and reminding me that I wasn't alone. He made it a priority to take me to dinner every week and choosing places and times that he knew that felt safe to me.

He never gave up on me and always showed up even when I was struggling to show up for myself. His consistency,

his patience, his gentleness, and his strength became something I learned and leaned on and depended on. Our dinners quickly became something that I looked forward to, my motivation to not give up. His personal growth is a testimony itself that reminds me to keep pushing when all odds are against me.

Looking back, he was saving my life without even realizing it. The way he loved me during that time was steady, intentional and selfless, and it's the same kind of love I now see him pouring into others.

I start nursing school in the fall and I'm gonna need my backbone. My father became a parent at just 18 years old and, yes, he's made mistakes. He made poor decisions, which made him face real consequences, but in the midst of that he had time to reflect and choose a path of transformation.

The man before you is not the same man he once was. There was a time where he kept to himself. He didn't allow himself to feel and he protected the wrong things. Because of that, there was a distance between us. He was hiding parts of his life and keeping me at arm's length, but over time I watched that version of him slowly fade.

Now he is someone you can sit with for hours, someone who truly listens, who opens up and allows himself to be vulnerable. He had become the most honest, most present,

most intentional person in the way he shows up for his people. The walls he had are now down, and in their place is humility and a genuine sacrificial kind of love.

That change has transformed our relationship. He no longer shuts me out, but invites me in; and through that I've been able to see not just my father, but a man who is actively trying to grow every single day to heal and to become better not only for others, but for himself.

Recently I was baptized, and I told him last minute knowing he likely wouldn't be able to make it; and he couldn't but he still got on his bike and drove a hundred miles just to hug me, congratulate me, and drive all the way back home.

That moment meant more to me than words can express, and it showed me how far he is willing to go just to show up for the people that he loves; and that is the man I see today, a father who is present, compassionate, and committed to doing what is right.

He has taken responsibility for his past and used his time to reflect, grow and change. I truly believe he has served his time with the willingness to become better, and he has come out with a renewed mindset and a sincere desire to live differently.

My mother -- my father has also endured significant personal loss, including the heartbreaking drowning of his baby boy, or my baby brother, Jayden. Despite that pain, I

believe God has given him another opportunity to step into fatherhood again with the birth of his new son, Anthony.

I see how seriously he takes that responsibility and how deeply he values the second chance. It has strengthened his commitment to being a better man and a better father, and I could not be more proud.

Before his initial incarceration, he was already beginning to repair his relationship with me. So the news I got on my birthday that he was going to be leaving was heartbreaking. After he got out, I have seen his continued effort to rebuild and maintain the bonds that were cut short. His story's the one I tell when someone thinks that their past defines them, and that is why I can confidently say without hesitation that my father is trying.

He is trying to make things right, and he is trying to move forward with purpose guided by his faith and his love for his family. Allowing him to remain at home would give him the opportunity to continue that growth, to be present with his children, and keep building his new life he so graciously got to receive.

With that in mind, I respectfully ask you to consider not only his path, but also the growth he has shown, the faith that now leads him, and the positive impact he continues to have on my life and the lives around him. I truly believe he is committed to continuing this path and

becoming the man God is calling him to be.

Thank you.

THE COURT: Thank you, Ms. Placsencia.

Ms. Verdura, if I could have you and your client approach again; and then anything you would like to say, Ms. Verdura.

MS. VERDURA: Yes, Your Honor, thank you.

As noted in my Sentencing Memorandum, we are seeking leniency in this case for many of the reasons that his family has just stated here on the record.

Mr. Placsencia since this incident has done -- put forth tremendous effort to turn his life around and to be a solid father figure, a solid partner to his spouse -- or, pardon me, significant other and a solid employee.

He's had a lot of accomplishments since this incident has happened. As I noted in my memo, he is gainfully employed and rapidly advanced in his career once he started working for the dealership. He was a model employee, and for that reason was offered multiple opportunities to advance in that career.

This incident that he participated in, obviously he's very remorseful for his conduct. He's accepted responsibility for his conduct. It is fairly old, the case. I know that doesn't negate what happened. I know that there are consequences for actions and he understands that and

appreciates that, but I think something that warrants consideration is the need for rehabilitation and the goal for society to have somebody reintegrate back into the community successfully so that they don't go on to continue to engage in illegal activity; and he has demonstrated since this incident has happened that he's perfectly capable of doing that and he has done that, and I think that's really important.

I think it shows this Court that he's not going to be a problem moving forward, and I think ultimately it achieves what hopefully as a society we want, which is people who are law abiding and productive members of society.

He's been on Pretrial Services now for several years. He's done tremendously well. I would argue to some extent that is in and of itself partially a consequence. He's been supervised as he would be on probation if he were to be given probation, which is what we are requesting in this case, notwithstanding his guidelines in this case.

Ultimately, Your Honor, we do believe that given the amount of progress that he's made since this incident, given the ways in which he has turned his life around, he's participated in treatment, he's participated in counseling, he's involved himself in outreach programs to give back to the community, he's strengthened his relationships with his children, he's a provider for his children and for his significant other.

I do believe that a term of incarceration at this stage would set him back and is just not necessary given his progress. I understand that there's a need for deterrence. I think as it pertains to Mr. Placsencia, that need has been fully achieved. I don't think the Court will ever see him again anywhere in any court anywhere in the United States. I don't believe that he has any interest whatsoever in involving himself in criminal activity.

The job that he has is a very good job. It allows him to provide for his children and for his significant other, and it would be a significant detriment and a setback to take him into custody. So we are asking that the Court take all of that into consideration and consider being lenient in this case.

As I mentioned in my memo, if that's simply not feasible, we would advocate for perhaps house arrest or, alternatively, no more than twelve months and one day though I don't think he needs to serve any time in the Bureau of Prisons. So I want to be clear on that, Your Honor; and, lastly, I do think he wants to make a final statement, Your Honor.

THE COURT: Okay. Mr. Placsencia.

THE DEFENDANT: First off, thank you everybody here. I'd like to thank my attorney and the District Attorney's Office --

THE COURT: Can I ask you to get close again to the microphone, sorry.

THE DEFENDANT: And I'd like to, obviously, apologize to anybody involved in this, especially my family, my kids, my mother.

Your Honor, I take full responsibility for, you know, anything that happens and for my actions, as I was ready to do so when I first contacted the ATF office almost six years ago.

I think I wrote everything that came from my heart to the letter that you brought up and I just -- you know, just want to apologize to my family.

THE COURT: Thank you, and I want to assure you I did read that letter carefully.

THE DEFENDANT: Thank you.

THE COURT: Have you been satisfied with the services Ms. Verdura provided to you?

THE DEFENDANT: Hundred percent.

THE COURT: Excellent.

Ms. Schesnol.

MS. SCHESNOL: Thank you, your Honor. This is -- this is a very difficult case and, frankly, I do not envy Your Honor's position having to make a decision of what sentence to impose.

I do not doubt for a second Mr. Placsencia's

sincerity. Quite frankly, if I did, I'd be the first one to say and I have in other cases with other defendants that sometimes I think their statements are disingenious.

I don't think that is the situation here at all, and that is evidenced by Mr. Placsencia's behavior to turn his life around, much of that on his own accord.

There are so many factors in this case that weigh in Mr. Placsencia's favor and weigh against him, and I view it as my role not to get the hardest sentence possible, but to advocate for the most just sentence; and so I want to lay out some of those factors that are in Mr. Placsencia's favor and those that are not.

His criminal history is a Category III and that is serious. However, I think that there is a way to view that as maybe disproportionately high. One of the points is for a reckless driving case from 2012, and reckless driving can certainly be serious. People can be injured or killed, but it is noteworthy that that is from well over a decade ago.

Also, there are three Criminal History Category points for a conviction from a crime that occurred after the dates of crime in this case and ultimately, then, the sentence for, obviously, after the dates of crime in this case; and so while those certainly do count -- that is how the Federal Sentencing Guidelines are drafted -- I do think that it is worthy of consideration that those three Criminal History

Category points didn't pre-date the crime there, because if they did I would definitely be standing here and arguing he didn't learn his lesson, he didn't learn his lesson, don't cut him a break, but that's -- that's not the fact pattern here.

So I think taking the Criminal History Category into consideration when ultimately crafting the appropriate sentence, the Court can take into consideration and certainly the government took into consideration in making a below guideline sentence; and I am not advocating for anything more than 36 months here, and if Your Honor believes a sentence below 36 months is appropriate, then the government certainly respects Your Honor's experience and discretion.

I'd also point out that the crimes in this case are very, very old; and I will not try to sugar coat it that the case should have been charged sooner, quite frankly, and that's on the United States Government. That is not Mr. Placsencia's fault.

Now, granted, the government is given a five-year statute of limitation to charge a case, but usually that has to do with ongoing investigation and the like, and that's not what happened here. The case sat for far too long and it shouldn't have, and that's not Mr. Placsencia's fault.

On the flip side, it did give Mr. Placsencia the opportunity to prove to the Court how much he could turn his life around on his own and, again, he began to turn his life

around before -- before this case was even charged; and the government gives that great weight and is yet another reason that the government is recommending a below guidelines sentence.

I agree that Mr. Placsencia does not need deterrence. I'm not particularly worried that he'd commit another crime in the future. I guess I'd have egg on my face if he did, but that's not something I stand here worried about; but I do also have to be concerned -- I think we all have to be concerned about other people being deterred from engaging in similar conduct, and so that has to be taken into consideration when factoring what is the appropriate sentence here.

We wouldn't want to send a message to other people that they could engage in this type of conduct and then have very little ramification or consequences. So we talk about the seriousness of the case. That's the factor that is the biggest negative going towards Mr. Placsencia and what kind of sentence would be imposed here.

This is a very serious case and we can't -- I mean, there's no sugar coating that. There's no undermining that, having dozens and dozens of firearms purchased, other people purchasing those firearms when they were really for Mr. Placsencia, and then at least some of those to be taken to Mexico.

I mean, that simply can't be understated. Firearms are lethal weapons. They kill people. They are outlawed in Mexico for a reason. Having them go to Mexico is extraordinarily serious. You know, we don't know whose hands they might fall into, what might become of those guns, who might be injured as a result of those guns. So we definitely cannot underestimate -- or undermine the seriousness of that.

Nor can we undermine the role within the case that was charged here. Four co-defendants were charged in this case, and Mr. Placsencia is listed first for a reason, because he recruited the other three people, a co-worker, a woman he knew in his life, and his mother. So his role in recruiting other people, it can't be underestimated and I think needs to be taken into consideration when weighing what's the appropriate sentence.

One of the other co-defendants has already been sentenced and she received probation, and so I just don't think it's fair when we look at how our similarly-situated defendants postured to give Mr. Placsencia the same sentence as someone else who was not as high in the quote/unquote "food chain."

And so where does that leave us? Again, I don't envy the position you sit in. This is a very difficult case. The government recommends no more than 36 months of incarceration. If the Court does impose incarceration and the

defendant wants to self-surrender and the Court is amenable to that, the government has no objection to it.

The government does believe that three years of supervised release following any period of incarceration is appropriate. The government moves to dismiss any outstanding counts within the indictment and also recommend the one hundred dollar special assessment. Thank you.

THE COURT: Thank you.

All right. Having considered the guidelines and the parties' arguments, I am accepting the plea agreement in this case and will impose a sentence that is consistent with it.

In arriving at a sentence today, I've considered all the documents that are in the file in this case, the comments that everyone has made here in court today and the sentencing factors under 18 USC §3553(a).

Mr. Placsencia, I'm sure Ms. Verdura has explained this to you and you've heard everyone referencing it in the courtroom today; but that law, 3553(a), tells me what to do as a sentencing judge, and that is to find a sentence for you that is sufficient but not more than necessary to reflect certain factors.

I have considered all of the relevant factors in arriving at a sentence that I believe is sufficient but not greater than necessary, but I'm going to explain a little bit more to you about some of them before I tell you what my

decision is in that sentence.

So as Ms. Schesnol was saying, the nature and the seriousness of this offense, which is one of the factors I have to consider, is extremely serious. We are talking about being the manager and the supervisor for all of the other co-defendants who were straw purchasing guns in this case.

You used the people that were straw purchasing, you used people that you had influence over, like a girlfriend at the time, your mother, a co-worker that you were supervising at work. I think the thing that makes this most serious to me is the number of firearms that were involved and who they were going to.

So we're talking at the very least dozens of firearms, possibly more like a hundred plus is what I saw in the Presentence Report, and those firearms -- and you knew this -- were going to the cartel in Mexico. You brought them there yourself. You knew others were being brought on your behalf, and one of them was found during a law enforcement incident in Mexico. So when I look at this case, it is to me a very serious one based on the way that the conduct happened here.

At the same time, there are some things that make it a little bit less serious. At the time that you were doing the straw purchasing it wasn't because were you a felon, although you got that felony conviction later, it was because

you didn't have an Arizona driver's license; and I also understand that you were in a scary situation yourself having been shot in the leg three times by the cartel and having your family in Mexico being threatened. So I think both of those are mitigating factors as to the seriousness of the offense.

Another factor I have to consider is your own history and characteristics, and as Ms. Schesnol was saying I think this is where it gets really difficult in terms of thinking about a sentence in this case.

I was impressed by so many things that I read about you. Obviously, you have very positive relationships with your family members. You're now in a stable relationship with Ms. Aguilar. You have a child with her and you, as today your family members described, you have been very supportive to them and have been, you know, a backbone of your family.

I also see that your family suffered really tragic circumstances in terms of your son, who nearly died in the drowning incident and who is now severely disabled and requires a lot of that care, and I totally understand how that incident would have a traumatic impact on you going forward as a father.

Then I've already talked about being shot in the leg by the cartel, but leading from that you yourself had to undergo serious medical care and rehabilitation to be able to recover from that.

I see a lot of really good things in your favor, too. You have a bachelor's degree. You're bilingual. Those are skills that are really going to help you going forward. You're a hard worker. The letter from the person at the Harley Davidson dealership talking about how you essentially have turned that business around through your own hard work, I have very rarely seen letters like that from an employer.

I learned today about the way that you are civic minded and, you know, promoting volunteer activities and that really impresses me also.

Another factor I have to consider is deterrence, and I think here deterrence, as everyone has been talking about, which basically just asks how much of a sentence is going to be necessary to prevent you and anybody else from committing this type of serious crime again in the future, I think deterrence as to you, specifically, is not the biggest factor in my mind.

That is because I believe that the measure of -- one of the best measures of how long of a sentence you need in terms of deterrence is the way that you act on pretrial release. Here, you had excellent performance on pretrial release for more than two years, which is a long time on pretrial release, and apart from that you are the person who initiated contact with law enforcement after learning that you were being looked at for this crime.

So I think you did a lot of things leading up to this that really show that you were turning your life around even before you were charged and pleaded guilty in this case.

Now, you do have some criminal history. Misdemeanor traffic-related crimes, those are very dated; but then, also, the felony drug-related conviction from 2021. Now, on that one, though, your state probation officer wrote a letter recommending a non-custody sentence on your behalf.

That is another thing I very rarely see, and so I think that speaks to the fact that a lower sentence than the guidelines call for is necessary for deterrence in your case.

At the same time I also have to take into account what other people might think when they look at this crime -- this very serious crime and think about committing a similar crime like that.

Finally, another factor that's really important here is avoiding unwarranted sentencing disparities; and what that means is sentencing people with similar backgrounds who committed similar conduct as part of the offense to similar things, but also making sure that differences between people are appropriately reflected.

As Ms. Schesnol was saying, I have sentenced one of your co-defendants in this case. That was Ms. Hughes, one of the straw purchasers, and I gave her a sentence of probation. She also had some really extraordinary mitigating factors and

had also performed really, really well on pretrial release.

So one of the things in my mind is that I need to reflect with your sentence the higher role that you played in this conspiracy and the fact that you were influencing people, like Ms. Hughes, to whom I gave probation.

So when I weigh all of those things together, as I said, I think a sentence far below the guidelines is appropriate in your case based on the extraordinary nature of so many of the factors that I have talked about.

At the same time, I can't sentence you to probation. I don't think that that would adequately account for deterrence or avoiding unwarranted sentencing disparities, and so I am going to give you a custody sentence in this case.

So pursuant to the Sentencing Reform Act of 1984, it's my judgment that Jose Antonio Santeros Placsencia is hereby committed to the Bureau of Prisons for 24 months.

You're going to pay a special assessment of one hundred dollars, which will be due immediately, and I find that you don't have the ability to pay a fine and order the fine to be waived. So that means you'll pay a total of one hundred dollars in criminal monetary penalties due immediately.

Having assessed your ability to pay, payment of the total criminal monetary penalties is due as follows: The balance is due in equal monthly installments of $25 over a

period of four months to start 60 days after your release from prison.

If incarcerated, payment of criminal monetary penalties is due during imprisonment at a rate of not less than $25 per quarter and shall be made through the Bureau of Prison's Inmate Financial Responsibility Program. I hereby waive the imposition of interest and penalties on any unpaid balance.

On release from prison you're going to be placed on supervised release for a period of three years. So let's talk a little bit about that three-year time period when you're going to be on supervised release.

Ms. Verdura, have you reviewed with Mr. Placsencia all of the standard and mandatory conditions of supervision in General Order 17-18 and the special conditions, all of which are in the Presentence Report?

MS. VERDURA: I have, Your Honor. He does understand the nature of those conditions. He does not oppose the imposition of any of those conditions, and he would waive a formal reading.

THE COURT: Thank you.

Mr. Placsencia, I want to make sure that you understood the conditions when Ms. Verdura explained them to you. Did you understand the conditions you'll have to follow while you're on supervised release?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Then I'll impose them.

While on supervised release you shall comply with the mandatory and standard conditions of supervision that are contained in General Order 17-18. Of particular importance, you shall not commit another federal, state or local crime during the term of supervision.

Within 72 hours of sentencing or release from the custody of the Bureau of Prisons, you shall report in person to the Probation Office in the district to which you are released.

I'm also imposing the special conditions that are listed in the Presentence Report with no changes to any of them. I will note that there is a heightened computer search condition in this case that requires you to submit things like laptop computers and desktop computers, cell phones to search by the probation officer.

I find this condition to be justified in this case because Internet firearms purchases did play a role in the offense. So the condition is necessary to deter and to continue protecting the public.

All right. Mr. Placsencia, I want to make sure that you have understood the sentence as a whole that I have imposed on you today. So in terms of custody, it's two years in the Bureau of Prisons. After that you'll be on supervised

release for three years, and during that three-year period of supervised release you're going to have to follow the terms and conditions that Ms. Verdura explained to you.

Do you understand the sentence I've imposed?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Your plea agreement contains an appellate waiver. It says that with two exceptions specifically described in the agreement you've given up your ability to appeal so long as the sentence I impose today is consistent with the agreement.

Do both counsel agree the sentence I've imposed is consistent with the agreement?

MS. SCHESNOL: Yes, Your Honor.

MS. VERDURA: Yes, Your Honor.

THE COURT: Then I find because the sentence is consistent with the plea agreement Mr. Placsencia has knowingly, voluntarily and intelligently waived his right to take an appeal or a collateral attack except for the two reasons specified in the plea agreement; but, Mr. Placsencia, if you wanted to try to take an appeal even though you've given up your right to do that, you would need to file a Notice of Appeal with the Clerk's Office within fourteen days of the date that judgment enters in your case.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: The remaining counts of the indictment are dismissed on Ms. Schesnol's motion as to Mr. Placsencia. I am very open to allowing self-surrender in this case so let's talk about a date that would be appropriate.

Ms. Verdura, do you want a little bit of time to confer with your client?

MS. VERDURA: Yes, please.

(Counsel and defendant confer.)

THE COURT: He would request 90 days, if the Court will accommodate that, so he can make arrangements with his employer.

THE COURT: I am willing to accommodate that.

Let's get you a date.

COURTROOM DEPUTY: July 20th.

THE COURT: All right. So, Mr. Placsencia, I am ordering that you will be allowed to self-surrender to the United States Marshal Service or the Bureau of Prisons. You might be designated to a Bureau of Prisons facility. So the Marshals might tell you to go straight to that facility as opposed to self-surrendering to them; but either way, if you haven't heard about a facility, you'll self-surrender to the United States Marshal Service. If you have heard about a facility you will self-surrender there, and the deadline for you to do that is July 20th of 2026.

I have no reason to believe that you're going to do

this, but failing to surrender by the deadline would be a new crime and so I need to advise you of that.

Is there anything else from either of the parties?

MS. SCHESNOL: Not from the government, Your Honor.

MS. VERDURA: Just for clarification, can he self-surrender in San Diego, to the US Marshals in San Diego?

THE COURT: I believe so, since that's where you're being supervised out of. Yes, you can surrender to the United States Marshal Service in the district where you're being supervised or to the Bureau of Prisons if you've been designated by that time.

MS. VERDURA: And would that be by 5:00 p.m.?

THE COURT: By 5:00 p.m. on July 20th.

MS. VERDURA: Thank you, Your Honor.

Nothing further from defense. He would ask, if possible, the Court could recommend that he be housed at a facility preferably in California or the southwest.

THE COURT: And you said San Diego is where his family is located?

MS. VERDURA: Yes.

THE COURT: All right. Then I am going to make that recommendation to facilitate family visitation that you be housed in or as near as possible to the Southern District of California, which is where San Diego is located.

THE DEFENDANT: Thank you, your Honor.

THE COURT: All right. Anything else?

MS. VERDURA: Nothing. Thank you, Your Honor.

MS. SCHESNOL: No, Your Honor, thank you.

THE COURT: All right, thank you very much.

Mr. Placsencia, I truly believe we won't see each other again in this courtroom, and I wish you the very best of luck.

THE DEFENDANT: Thank you, your Honor.

*(Whereupon the proceedings ended.)*

***REPORTER'S CERTIFICATION***

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 20th of May, 2026.

s/Teri Veres
TERI VERES, RMR, CRR